IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO. 4:22-CR-34-O |
| v. | |
| JEFFREY PAUL MADISON (01) | |

### AMENDED FACTUAL RESUME

PLEA TO COUNT ONE AND TWO OF THE INDICTMENT:
Count One: Conspiracy to Pay and Receive Health Care Kickbacks, in violation of 18 U.S.C. § 371, with the underlying substantive offense of Paying and Receiving Health Care Kickbacks, in violation of 42 U.S.C. §§ 1320a-7b(b)(1)(A), 1320a-7b(b)(2)(A), 1320a-7b(b)(2)(B) and 1320a-7b(b)(1)(B).

Count Two: Paying and Receiving Health Care Kickbacks, in violation of 42 U.S.C. §§ 1320a-7b(b)(2)(A) and (b)(2)(B).

MAXIMUM PENALTY:
Count One – $250,000 fine and not more than five (5) years imprisonment, plus a term of supervised release of not more than 3 years. If the defendant violates any condition of supervised release, the Court may revoke such term of supervised release and require the defendant to serve an additional period of confinement. Further the Court must impose a Mandatory Special Assessment of $100.00.

Count Two – $100,000 fine and not more than ten (10) years imprisonment, plus a term of supervised release of not more than 3 years. If the defendant violates any condition of supervised release, the Court may revoke such term of supervised release and require the defendant to serve an additional period of confinement. Further the Court must impose a Mandatory Special Assessment of $100.00.

ELEMENTS OF THE OFFENSE:
The essential elements which must be proved beyond a reasonable doubt in order to establish the offense charged in Count One of the Indictment, are as follows:[1]

> First.   That the defendant and at least one other person made an agreement to commit the crime of paying and receiving illegal kickbacks, in violation

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2019).

Factual Resume—Page 1

of the Anti-Kickback statute as charged in the indictment;

Second. That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and;

Third. That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

The essential elements which must be proved beyond a reasonable doubt in order to establish the offense charged in Count Two of the Indictment, are as follows:[2]

First. That the defendant paid or offered to pay codefendant Keith Wichinski any remuneration, including any kickback, bribe, or rebate;

Second. That the defendant did so to induce Keith Wichinski to refer urine tests to Unified Laboratory Services, LLC and Spectrum Diagnostic Laboratory, LLC;

Third. That the urine test was one for which payment was or might be made, in whole or in part, under a federal health care program; and

Fourth. That the defendant acted knowingly and willfully when paying or offering to pay that remuneration.

## STIPULATED FACTS:

1. Defendant **Jeffrey Paul Madison** was a resident of DeSoto, Texas.

2. Unified Laboratory Services, LLC ("Unified") was a clinical medical laboratory company that performed diagnostic testing including blood, toxicology, respiratory, and genetic testing. Unified submitted claims for reimbursement for its work to a variety of insurance entities, including federal healthcare programs, such as Medicare, Tricare, and the Railroad Retirement Board. Unified was located in Fort Worth, Texas,

---

[2] Fifth Circuit Pattern Jury Instruction 2.109B (5th Cir. 2019).

Factual Resume—Page 2

DocuSign Envelope ID: D2FEAA0B-B21D-4D12-8635-A99E44C81378

and was founded in May 2012 by defendant **Jeffrey Paul Madison** and another individual, identified here as S.K.

3. **Madison** possessed little to no experience in the laboratory field or healthcare industry prior to the creation of Unified. Madison and S.K. were long-time friends.

4. **Madison** also founded Spectrum Diagnostic Laboratory, LLC ("Spectrum"), in March 2014, in Arlington, Texas. Unified performed the initial "presumptive" test on a specimen, and Spectrum performed the second "confirmatory" test on a specimen. Spectrum also submitted claims for reimbursement for its work to Medicare.

5. Unified and Spectrum shared some employees, payroll, finances, owners, and management. Unified and Spectrum acted as the same entity, however under different names and addresses.

6. Reliable Labs, LLC ("Reliable") was a clinical medical laboratory company that offered toxicology testing. Reliable was located in Carrolton, Texas, and was founded in July 2014 by codefendants Biby Ancy Kurian and Abraham Phillips. Reliable began operating as a business in early 2015.

7. In September and October 2015, **Madison** approached Kurian and Phillips through a third-party to discuss a potential partnership. **Madison** proposed that Reliable be converted to a physician-owned laboratory and thereafter only handle testing that would be reimbursed by private insurance companies, as opposed to government programs, such as Medicare. Kurian and Phillips eventually agreed, and **Madison and S.K.** received an ownership interest in Reliable through an entity that he created.

Factual Resume—Page 3

8. Codefendant David Michael Lizcano owned and operated David-Claudia-Lauren Holdings, LLC, ("DCLH") located in San Antonio, Texas. DCLH was a marketing firm for various laboratories, including Unified, Spectrum, and Reliable.

9. Codefendant Juan David Rojas was a marketer. He operated a business, known as Rojas & Associates, LLC.

10. **Madison** hired Lizcano and Rojas to perform sales and marketing services for Unified, Spectrum, and Reliable.

11. **Madison** created and utilized a variety of entities to make payments to marketers. These entities included: MBK Consortium and MBK Labs – Carrolton 1 LLC.

12. Codefendant Keith Allen Wichinski was a board-certified Nurse Practitioner, who was based in San Antonio but worked in a variety of locations throughout Texas. As a Nurse Practitioner, Wichinski often ordered certain tests to be performed for his patients. Wichinski submitted over 4,000 orders to Unified and Spectrum between October 2015 and February 2018. These orders resulted in billings by Unified and Spectrum in excess of $21 million, including over $14 million to federal health care programs.

13. In an effort to maximize profits, **Madison** sought to financially incentivize medical providers to send additional tests to Unified, Spectrum, and Reliable by providing them with illegal financial incentives that were disguised to appear as legitimate business transactions.

14. The illegal financial incentives (kickbacks) included lease payments. **Madison** authorized payments to medical providers that appeared to represent a lease payment for a portion of the medical provider's office.

Factual Resume—Page 4

15. At Madison's direction, Unified performed an evaluation of a medical provider before offering a lease payment by examining their referral history. Unified determined whether it would be profitable to pay a particular medical provider a lease payment. Medical providers were told that only those who referred a minimum number of laboratory tests per month to Unified would be considered for a lease agreement.

16. **Madison**, along with the medical providers who accepted the payments, such as Wichinski, and the marketers, such as Lizcano and Rojas made it appear as though Unified and Spectrum were leasing space in the medical provider's office so that their collectors could perform collection activities. The lease payments, however, were not based solely on legitimate rentals of space. Instead, the decision to enter into lease was also based on arbitrary information, made retroactive to a date when a medical provider provided their first referral, lasted less than 12 months, and took into account the referral volume of a provider. At Madison's direction, Boggess processed and facilitated the payments, knowing that they were not based solely on actual lease space. In exchange, medical providers increased the number of referrals that they sent to Unified and Spectrum, including those reimbursed by Medicare, Tricare, and RRB.

17. **Madison**, Lizcano, and Rojas kept detailed records regarding the referral numbers of each medical provider so that Lizcano, and Rojas could receive payment for performing sales and marketing services.

18. For example, and as **Madison** knew, marketers, such as Lizcano and Rojas were paid based on a percentage of referrals that they brought to Unified and Spectrum. These included referrals that were reimbursed under Medicare, Tricare, and RRB. In 2018,

Boggess, at the direction of **Madison** worked with marketers to create fake invoices to make it appear as though they were being paid on an hourly basis when, in fact, they were being paid based on volume referral. Following the completion of the invoices, Boggess facilitated payments to the marketers.

19. Between September 2015 and September 2017, entities controlled by **Madison** made approximately 68 different payments to DCLH, controlled by Lizcano, totaling over $7.9 million.

20. In the fall of 2015, **Madison** approached Kurian and Phillips and suggested that they convert Reliable into a physician-owned lab ("POL"). As all four knew, a lab that processed and sought reimbursement from federal healthcare programs (i.e. Medicare, Tricare, and RRB), like Unified and Spectrum, could not operate as a POL. But **Madison** also knew that physicians could be compensated significantly through a POL. **Madison** sought to convert Reliable for this purpose.

21. **Madison** knew, and explained to Kurian and Phillips, that many of the referring physicians to Unified and Spectrum were seeking additional sources of revenue (such as a POL) and it was essential to **Madison**'s business that these physicians remained happy customers. Reliable was attractive to **Madison** because it was already operational and had already received its license to operate.

22. **Madison**, Kurian, and Phillips agreed that they would recruit physicians to join Reliable as owners based on prior or projected referral volume to Reliable. Those with higher referral volume were considered more attractive potential owners to Reliable and

those with lower volume were considered less attractive to Reliable. Other factors were not considered.

23. Kurian analyzed referral volume to determine whether ownership shares (known as units) should be decreased or increased.

24. In effect, as **Madison** knew, the ownership units in Reliable would ensure that physicians would continue to refer samples to Unified and Spectrum.

25. On several occasions, as **Madison** knew, Reliable made advance disbursement payments to physicians in an effort to appease that physician and ensure that the physician would not send samples to labs other than Unified, Spectrum, and Reliable.

26. As a specific overt act in furtherance of the conspiracy, and as the basis for Count Two, **Madison** authorized the payment of $850 to Wichinski on or about March 6, 2017. This payment was disguised as a lease payment, but was, in fact, a kickback.

27. For the relevant time period, Unified and Spectrum received approximately $10.4 million in payments from Medicare, Tricare, and RRB.

28. **Madison** agrees that during the relevant time period, Unified and Spectrum, at the direction of Madison, made payments in violation of the Anti-Kickback statute that were between $3.5 million and $9.5 million as those figures are determined in USSG §§ 2B1.1 and 2B4.1. **Madison** admits that this is correct calculation to use for loss purposes under the U.S. Sentencing Guidelines.

29. The defendant agrees that the defendant committed all the essential elements of the offenses. This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this

statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Counts One and Two of the Indictment.

AGREED TO AND STIPULATED on this ____ day of _____3/10/2022 | 6:13:31 PM EST_____, 2022.

_____
Jeffery Paul Madison
JEFFREY PAUL MADISON
Defendant

_____
Sam Louis
SAMUEL LOUIS
Attorney for Defendant

Factual Resume—Page 8